McCANLES BUILDING COMPANY, a Corporation, Appellant, v. MISSOURI STATE LIFE INSURANCE COMPANY, a Corporation.—93 S. W. (2d) 917.

Division One, April 23, 1936.

*Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellant.

1072

*Williams, Nelson & English, Allen May,* and *McAllister, Humphrey, Pew & Broaddus* for respondent.

FRANK, J.—Action by appellant, plaintiff below, for the alleged conversion by defendant, as of December, 1930, of United States Government bonds of the par value of $25,000, alleged to have been worth $800 in excess of the par value at the time of the conversion. The petition prayed judgment for the value of the bonds with interest from date of the alleged conversion. Jury waived and cause tried to the court resulting in a finding and judgment for defendant and plaintiff appealed.

The facts giving rise to this controversy are, in substance, as follows:

Plaintiff was owner of what is known as the Alcazar Hotel in Kansas City, Missouri, encumbered by a deed of trust owned and held by defendant, in the principal sum of $250,000. As additional security for this loan plaintiff had deposited with defendant government bonds of the par value of $40,000.

Defendant was the owner of fourteen farms in Audrain County. On February 25, 1927, plaintiff and defendant entered into a written contract by the terms of which it was agreed that plaintiff's equity in the hotel property was to be exchanged for thirteen of defendants' fourteen Audrain County farms, free of incumbrance. The contract further provided that when said exchange of properties was consummated, the defendant should return to plaintiff the $40,000 in government bonds theretofore pledged as additional security for the loan on the hotel property.

On April 1, 1927, the parties entered into a supplemental agreement providing that defendant should convey to plaintiff one additional Audrain County farm (making in all fourteen farms containing 3104 acres), and that defendant would make plaintiff a loan on said lands. The original draft of this supplemental agreement, prior to its executions as a binding contract, contained the following provisions concerning the loan:

"The Missouri State Life Insurance Company further agrees to loan the McCanles Building Company, its nominee or nominees, an average of $40.00 per acre on the entire acreage in Schedule B, and the additional acreage above described, aggregating 3104 acres, making loans aggregating $124,160.00. Said loans to run for a period of ten years, bearing interest from date of loans at 6% per annum, payable annually, with the prepayment privilege on any date without notice to the said second party, and it is further agreed by the said Missouri State· Life Insurance Company, party of the second part, to make loans on each farm to an actual and bona fide purchaser of said farm, for a sum approximately $32.00 per acre, to run over a period of 25 years, to be amortized on a 6% basis, and on the execution of said papers and transfer of said property, the said Missouri State Life Insurance Company, party of the second part, agrees to release from all liability the said McCanles Building Company, or its nominee.

"As additional collateral security, the McCanles Building Company agrees to deposit with the Missouri State Life Insurace Company $25,000.00 in United States Government Bonds, being $25,000.00 of the Government Bonds now held by the Missouri State Life Insurance Company, in connection with its original loan of $250,000.00 on the Alcazar Hotel property, as described in said Exchange Con-

tract, which contract provides for the release and re-delivery to McCanles Building Company, said $40,000.00 Government Bonds, upon the consummation of this exchange. Said bonds to be held by the said Missouri State Life Insurance Company until all of said lands have been sold to actual and bona fide purchasers, at which time they are to be returned to the McCanles Building Company, or its nominee.''

On April 4, 1927, defendant wrote plaintiff the following letter:

''Am happy to inform you that our Executive Committee has approved the exchange contract between your company and ours, dated February 25, 1927, with the supplemental agreement made between us on the first of April.

''Upon re-examination of the supplemental agreement as reduced to writing, I find that one element of the agreement was inadvertently omitted from the memorandum and the approval of the Executive Committee is conditioned upon your acceptance of an amendment recording our true agreement evidence of your acceptance being by endorsement on the enclosed copy of this letter.

''In Paragraph No. 2 of the Supplemental agreement, it is provided that we are to lend back on the farms an average of $40.00 per acre for ten years at 6% and that to bona fide purchasers from the nominees we will receive the loan on a basis approximating $32.00 per acre at 6%, amortized over twenty-five years, releasing your company or nominee from all personal liability on the original loan. What the memorandum does not say and what we agreed, was that the difference between $40.00 per acre and $32.00 per acre, to-wit, $8.00, should be paid in cash as a consideration of our making the longer amortized loan and releasing you or your people; or, in other words, that out of the sales price to your purchasers as much as 20% of the amount of our first mortgage loan should be obtained and paid to us in cash as a consideration of our making the long term loan.

''This having been clearly understood between us, you will, of course, have no objection to its being incorporated in the contract which may be done by your acceptance as above suggested.''

On April 5, 1927, plaintiff replied to defendant's letter of April 4, 1927, as follows:

''Yours of the 4th at hand and I am returning the copy properly signed. You are correct in your statement that this was the agreement. We discussed this feature at the time we drew the contract and thought it was sufficient to state it as it was stated, but I believe it is better as you say to have it more definitely set out.

''I have phoned Mr. Norman and he is having the abstract brought to date immediately and will forward for your examination as quickly as possible. You can draw the loan papers and forward for signature of George C. Low and Helen Low, husband and wife.

"I will be ready to meet Mr. Stubblefield, or one of your representatives at any time it is convenient to go over the list of necessary improvements to be made on the farms, but I assume that it will be satisfactory to do this after the deal is closed, but if you prefer I am ready to make the inspection at any time before or after the closing of the deal."

The original draft of the supplemental agreement contained the following provision:

"This agreement executed in triplicate by McCanles Building Company and Missouri State Life Insurance Company being signed today by party of the second part, but it shall not be binding on the said party of the second part until approved by the executive committee of said Missouri State Life Insurance Company at their next meeting to be held Monday, April 4, 1927, or Tuesday, April 5, 1927."

This stipulation in the original draft of the contract expressly provides that the proposed contract, although signed by defendant, would not be binding until approved by defendant's executive committee. Defendant's letter to plaintiff enclosing copy of the proposed contract expressly states that defendant's executive committee approved the proposed contract on condition that plaintiff would accept the amendment proposed in defendant's letter as a part of the contract. Plaintiff signed the proposed contract and returned it to defendant in a letter, stating therein, "Yours of the 4th at hand and I am returning the copy properly signed. You are correct in your statement that this was the agreement. We discussed this feature at the time we drew the contract and thought it was sufficient to state it as it was stated, but I believe it is better as you say to have it more definitely set out." The amendment proposed in defendant's letter, and plaintiff's acceptance thereof, before the contract was executed, made such amendment a part of the contract.

On April 15, 1927, a second supplemental agreement was made providing that interest on the $25,000 in government bonds collected during the period defendant held such bonds as collateral security should be paid to plaintiff. This agreement also provided how such bonds should be applied in event default was made in payment of the loan or interest thereon.

After above agreements were made, plaintiff conveyed its equity in the Alcazar Hotel property to defendant, and defendant conveyed to plaintiff the fourteen Audrain County farms totaling 3104 acres. Thereafter defendant made plaintiff a loan of $40 per acre on the fourteen farms. This loan was secured by deeds of trust on the farms, and by depositing with defendant $25,000 in government bonds as additional security thereon. After this loan was made, plaintiff disposed of the fourteen farms by selling two of them to individuals and trading the remaining twelve to Safety Savings & Loan As-

sociation for a hotel property in Kansas City, known as Drakehurst Hotel, which such loan association had acquired at a foreclosure sale under a deed of trust which it held on the hotel property.

Plaintiff interprets the loan contract as meaning that when it disposed of the fourteen farms to bona fide purchasers, it was entitled to a return of the $25,000 in government bonds which it had theretofore deposited with defendant as additional security on the original loan of $40 per acre. Based on this interpretation of the loan contract, it is contended that the two individuals to whom two of the farms were sold, and the Safety Savings & Loan Association to which the remaining twelve farms were traded, were actual bona fide purchasers of the farms, and hence plaintiff complied with the conditions entitling it to a return of the bonds.

Defendant contends that the contract, properly interpreted, means that to entitle plaintiff to a return of the bonds, it must not only sell all the farms to actual bona fide purchasers, but it must also reduce the loan from $40 per acre to $32 per acre and pay to defendant the amount of such reduction in cash.

We agree with defendant's interpretation of the contract. The contract as originally drawn, after providing that defendant would make plaintiff a loan of $40 per acre on all the farms, further provides that defendant agrees, "to make loans on each farm to an actual and bona fide purchaser of said farm, for a sum approximating $32 per acre, to run over a period of twenty-five years, to be amortized on a 6% basis, *and on the execution of said papers and the transfer of said property,* the said Missouri State Life Insurance Company, party of the second part, agrees to release from all liability the said McCanles Building Company, or its nominee."

From the language of the contract it is clear that plaintiff's release from all liability is conditioned upon "the execution of said papers and the transfer of said property" which necessarily means the transfer of the farms to actual bona fide purchasers and their execution of the necessary papers for a loan of $32 per acre to take the place of the original loan of $40 per acre made to plaintiff. It is unthinkable that plaintiff would be entitled to a return of the bonds it pledged as security for the loan of $40 per acre, until it was released from liability it assumed in connection with that loan. Since the contract conditions plaintiff's release from such liability on the transfer of the farms to actual bona fide purchasers, and the reduction of the loan from $40 to $32 per acre, it is not entitled to a return of the bonds until the farms are so transferred, and the loan is so reduced.

It is true that the original draft of the contract, heretofore set out, provides that the bonds are to be held by the Missouri State Life Insurance Company until all of the farms are sold to actual and

bona fide purchasers, at which time they are to be returned to the McCanles Building Company, or its nominee. However, this provision of the contract must be read in connection with other provisions of the same contract which provide how the sales must be made to bona fide purchasers. In order to be in a position to demand a return of the bonds upon a sale of the lands to bona fide purchasers, plaintiff must make such sales in the manner provided in the contract.

It clearly appears from the provisions of the contract that plaintiff would not be entitled to sell the lands to bona fide purchasers and claim a return of the bonds on that ground, unless it had collected as much as eight dollars per acre from such purchasers and paid that amount to defendant, thereby reducing the original loan of $40 per acre to $32 per acre. We agree that plaintiff is entitled to a return of the bonds when all the land is sold to bona fide purchasers, but plaintiff cannot comply with the contract and sell the lands to bona fide purchasers without collecting from them as much as eight dollars per acre and paying that amount to defendant, because the contract so provides. Note its language. ". . . and that to bona fide purchasers from the nominees we will receive the loan on a basis approximating $32 per acre at 6% amortized over twenty-five years, *releasing your company or nominee from all personal liability on the original loan.*" Again the contract provides that, "$8 per acre should be paid in cash as a consideration of our making the longer amortized loan *and releasing you or your people.*" Again the contract says, "That out of the sale price to your purchasers as much as 20% of the amount of our first mortgage loan should be obtained and paid to us in cash as a consideration for us making the longer term loan."

Since the bonds in question were pledged to secure the payment of the original loan of $40 per acre, plaintiff would not be entitled to a return of such bonds until it was released from liability on the loan. Under the plain terms of the contract, plaintiff could not be released from liability on the original loan until the purchasers to whom the land was sold paid defendant $8 per acre on the original loan and made a new loan of $32 per acre to take the place of the original loan. No claim is made that the alleged bona fide purchasers paid the $8 per acre on the original loan or made or offered to make the new loan of $32 per acre. The original loan of $40 per acre was left in force with the $25,000 in bonds pledged as additional security for its payment. For these reasons plaintiff failed to make a case entitling it to a return of the bonds of judgment for their value.

Evidently both parties thought the original loan of $40 per acre was excessive because defendant exacted and plaintiff deposited with

defendant $25,000 in bonds as additional security for that loan. The fourteen farms comprise 3104 acres. The eight dollars per acre required to be paid by the bona fide purchasers of the land would reduce the original loan approximately $25,000, the amount of the bonds. These facts furnish cogent reasons why defendant would agree to return the $25,000 in bonds to plaintiff when all the lands were sold to bona fide purchasers, provided such purchasers would pay in cash at least eight dollars per acre thereby reducing the original loan approximately $25,000.

Many other questions are raised by both parties, but since plaintiff failed to make a case, if the other questions raised were determined in plaintiff's favor the result would not be changed, hence we decline to discuss them.

The judgment below should be affirmed. It is so ordered. All concur.